[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

No. 02-11303

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 21 2002
THOMAS K. KAHN
CLERK

D. C. Docket No. 01-01866 CV-PT-S

RODERICK JACKSON,

Plaintiff-Appellant,

versus

BIRMINGHAM BOARD OF EDUCATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(October 21, 2002)

Before DUBINA, MARCUS and GOODWIN*, Circuit Judges.

_____

*Honorable Alfred T. Goodwin, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

MARCUS, Circuit Judge:

Roderick Jackson appeals the dismissal of his complaint alleging that the Birmingham Board of Education (the "Board") retaliated against him in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq., and the regulations implementing it. While employed by the Board as the coach of a girl's basketball team, Jackson complained about practices that he believed discriminated against his team in violation of Title IX. The school, he maintains, retaliated against him by removing him from his coaching position. The question before us is whether Title IX implies a private right of action in favor of individuals who, although not themselves the victims of gender discrimination, suffer retaliation because they have complained about gender discrimination suffered by others. After review of the text and structure of the statute, we can discern no congressional intent in Title IX to create by implication such a private cause of action. Accordingly, we affirm the dismissal of Jackson's complaint.

I.

A.

We review de novo an order granting a motion to dismiss the complaint, see McDonald v. S. Farm Bureau Life Ins. Co., 291 F.3d 718, 722 (11th Cir. 2002), taking the facts alleged in the complaint as true and construing them in the light most

2

favorable to the plaintiff. See Covad Communications Co. v. Bellsouth Corp., 299 F.3d 1272, 1276 n.2 (11th Cir. 2002); Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990) ("On a motion to dismiss, the facts stated in appellant's complaint and all reasonable inferences therefrom are taken as true."). "A motion to dismiss is only granted when the movant demonstrates 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957)).

## B.

According to his complaint, Jackson was hired by the Board as a physical education teacher and girls' basketball coach on or about August 1993. He was transferred to Ensley High School in August 1999, where his duties included coaching the girls' basketball team. While coaching at Ensley, Jackson came to believe that the girls' team was denied equal funding and equal access to sports facilities and equipment. He complained to his supervisors about the apparent differential treatment and, shortly thereafter, he began receiving negative work evaluations. Jackson was ultimately relieved of his coaching duties in May 2001, but remains employed as a tenured physical education teacher.

3

We assume for purposes of this appeal that the Board retaliated against Jackson for complaining about perceived Title IX violations. The only question before us today is whether Title IX provides Jackson a private right of action and a private remedy against the Board for its allegedly retaliatory actions. Conceding that Title IX creates no private rights of action expressly, see Cannon v. Univ. of Chicago, 441 U.S. 677, 683, 99 S. Ct. 1946, 1950, 60 L. Ed. 2d 560 (1979) ("The statute does not . . . expressly authorize a private right of action by a person injured by a violation of § 901."), Jackson claims that such a right is impliedly created by §§ 901 and 902 of Title IX, 20 U.S.C. §§ 1681-82, in conjunction with 34 C.F.R. § 100.7(e), an anti-retaliation regulation promulgated by the Department of Education to enforce Title IX.

Section 901 of Title IX, with certain exceptions not at issue here, provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).[1]

---

[1] In relevant part, § 901, 86 Stat. 373, as amended, as set forth in 20 U.S.C. § 1681, provides:

(a) Prohibition against discrimination; exceptions

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination

In section § 902, Congress created and authorized an elaborate administrative

enforcement scheme for Title IX. See Davis v. Monroe County Bd. of Educ., 526

U.S. 629, 638-39, 119 S. Ct. 1661, 1669, 143 L. Ed. 2d 839 (1999).[2] Pursuant to §

under any education program or activity receiving Federal financial assistance . . .

(b) Preferential or disparate treatment because of imbalance in participation or receipt of Federal benefits; statistical evidence of imbalance

Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: Provided, That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

(c) "Educational institution" defined

For purposes of this chapter an educational institution means any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department.

[2]Section 902, 86 Stat. 374, as set forth in 20 U.S.C. § 1682, titled "Federal administrative enforcement; report to Congressional committees," provides in relevant part:

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity . . . is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability . . . . No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any

902, any federal department or agency that "is empowered to extend Federal financial assistance to any education program or activity" is "authorized and directed to effectuate the provisions of" § 901. 20 U.S.C. § 1682. To do so, agencies are required to "issu[e] rules, regulations, or orders of general applicability," which do not "become effective unless and until approved by the President." Id. The primary enforcement mechanism that § 902 gives to agencies is cessation of federal funding: "[c]ompliance with any requirement adopted pursuant to this section may be effected . . . by the termination of or refusal to grant or to continue assistance . . . ." Id.

There are a number of procedural requirements that must be met, however, before an agency may cut off funding. First, an agency must attempt to obtain voluntary compliance with the requirements it has imposed to enforce § 901: "no . . .

---

requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement . . . , or (2) by any other means authorized by law: Provided, however, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." Id. Second, if an agency fails to obtain voluntary compliance, an agency must hold a hearing regarding any alleged regulatory violation, because only a "recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with" a regulation enacted pursuant to § 902 may have its funding cut off. Id. Third, even after making an "express finding" of noncompliance, an agency may not cut off funding unless it files "a full written report" to "the committees of the House and Senate having legislative jurisdiction over the program or activity involved" and waits "until thirty days have elapsed after the filing of such report." Id.[3]

---

[3]In addition to the congressional review required by § 902, § 903 of Title IX, 86 Stat. 374, as set forth in 20 U.S.C. § 1683, provides for judicial review of "[a]ny department or agency action taken pursuant to section [902]." 20 U.S.C. § 1683. Section 903 provides in full that:

> Any department or agency action taken pursuant to section 1682 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that title.

Using the authority vested in it by § 902, the Department of Education promulgated 34 C.F.R. § 100.7(e),[4] which prohibits retaliation against anyone who complains of a Title IX violation:

> No recipient [of federal funds] or other person shall intimidate, threaten, coerce, or discriminate against <u>any individual</u> for the purpose of interfering with any right or privilege secured by section [901 of Title IX] of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part.

34 C.F.R. § 100.7(e) (emphasis added).

Jackson urges that a private right of action ought to be implied in his favor from the statute and, more particularly, from 34 C.F.R. § 100.7(e). We are unpersuaded. For the reasons we make clear below, we hold that neither Title IX itself nor 34 C.F.R. § 100.7(e) implies a private right of action for retaliation in Jackson's favor.

### C.

Our analysis of Jackson's claim is governed in substantial measure by the Supreme Court's recent decision in <u>Alexander v. Sandoval</u>, 532 U.S. 275, 121 S. Ct.

---

[4]34 C.F.R. § 100.7(e) was originally promulgated by the Department of Justice to enforce Title VI of the Civil Rights Act of 1964 ("Title VI"), 78 Stat. 252, as amended, 42 U.S.C. § 200d <u>et seq.</u> The Department of Education has incorporated by reference § 100.7(e) and other regulations enforcing Title VI to enforce Title IX. <u>See</u> 34 C.F.R. § 106.71.

1511, 149 L. Ed. 2d 517 (2001), which we explicate fully for three reasons. First,

Sandoval distills and clarifies the approach we are obliged to follow in determining

whether to imply a private right of action from a statute.[5] Second, Sandoval resolved

a claim under Title VI of the Civil Rights Act of 1964 ("Title VI"), 78 Stat. 252, as

---

[5]The Supreme Court implied private rights of action with a relatively free hand, see J.I. Case Co. v. Borak, 377 U.S. 426, 433-34, 84 S. Ct. 1555, 1560, 12 L. Ed. 2d 423 (1964), until its decision in Cort v. Ash, 422 U.S. 66, 95 S. Ct. 2080, 45 L. Ed. 2d 26 (1975). In Cort, the Court articulated four factors that must be considered before a private right of action may be implied:

First, is the plaintiff "one of the class for whose especial benefit the statute was enacted" -- that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. at 78, 95 S. Ct. at 2088 (quoting Texas & Pac. Ry. Co. v. Rigsby, 241 U.S. 33, 39, 36 S. Ct. 482, 484, 60 L. Ed. 874 (1916)) (additional citations omitted). Since the late 1970's, the Court has gradually receded from reliance on three of these four factors, focusing more and more exclusively on legislative intent alone. See, e.g., Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 15-16, 100 S. Ct. 242, 245, 62 L. Ed. 2d 146 (1979) ("While some opinions of the Court have placed considerable emphasis upon the desirability of implying private rights of action in order to provide remedies thought to effectuate the purposes of a given statute, what must ultimately be determined is whether Congress intended to create the private remedy asserted . . . .") (citations omitted); Touche Ross & Co. v. Redington, 442 U.S. 560, 575, 99 S. Ct. 2479, 2489, 61 L. Ed. 2d 82 (1979) (the "central inquiry" is "whether Congress intended to create, either expressly or by implication, a private cause of action"); Thompson v. Thompson, 484 U.S. 174, 179, 108 S. Ct. 513, 516, 98 L. Ed. 2d 512 (1988) ("The intent of Congress remains the ultimate issue . . . ."). Sandoval is the culmination of this trend, announcing that "[s]tatutory intent . . . is determinative." 532 U.S. at 286, 121 S. Ct. at 1519; see also Gonzaga Univ. v. Doe, -- U.S. --, 122 S. Ct. 2268, 2276-77, 153 L. Ed. 2d 309 (2002) (applying Sandoval mode of analysis). The other three Cort factors remain relevant only insofar as they provide evidence of Congress's intent. See Thompson, 484 U.S. at 189, 108 S. Ct. at 521 (Scalia, J., concurring in the judgment) (The Court has "convert[ed] one of [the Cort test's] four factors (congressional intent) into the determinative factor, with the other three merely indicative of its presence or absence.") (emphasis in original).

amended, 42 U.S.C. § 2000d et seq., which is the model for Title IX and whose language Title IX copies nearly verbatim. See Cannon, 441 U.S. at 694-95, 99 S. Ct. at 1956-57 ("Title IX was patterned after Title VI . . . . Except for the substitution of the word 'sex' in Title IX to replace the words 'race, color, or national origin' in Title VI, the two statutes use identical language to describe the benefited class."); see also id. at 694-696 nn.16 & 19, 99 S. Ct. at 1956-57 nn. 16 & 19 (setting forth the legislative history of Title IX, which, inter alia, notes that "[t]his is identical language, specifically taken from Title VI"). Because we therefore read Titles VI and IX in pari materia, Sandoval's interpretation of Title VI powerfully informs our reading of Title IX. Third, like Jackson, the plaintiffs in Sandoval relied on a regulation promulgated to enforce Title VI as the basis for implying a private right of action.

In Sandoval, the Supreme Court held that Title VI does not imply a right of action for private litigants to sue recipients of federal funds for "disparate impact" violations. See Sandoval, 532 U.S. at 293, 121 S. Ct. at 1523. At issue in Sandoval was the claim that the Alabama Department of Public Safety's policy of administering all tests for drivers' licenses in English only has a discriminatory effect on racial minorities. Section 601 of Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from

10

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Recognizing that Title VI itself reaches only acts of intentional discrimination, see Alexander v. Choate, 469 U.S. 287, 293, 105 S. Ct. 712, 716, 83 L. Ed. 2d 661 (1985), the plaintiff in Sandoval alleged that Alabama's restriction violated 28 C.F.R. § 42.104(b)(2), a Department of Justice regulation promulgated pursuant to § 602 of Title VI,[6] that forbids recipients of federal funding from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin . . . ." 28 C.F.R. § 42.104(b)(2) (1999) (emphasis added).[7]

_____

[6]Section 602 authorizes and directs "[e]ach Federal department and agency which is empowered to extend Federal financial assistance to any program or activity . . . to effectuate the provisions of [§ 601] with respect to such program or activity by issuing rules, regulations, or orders of general applicability . . . ." 42 U.S.C. § 2000d-1.

[7]28 C.F.R. § 42.104(b)(2) provides in full that:

> A recipient, in determining the type of disposition, services, financial aid, benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin.

The Department of Transportation has promulgated an identical regulation. See 49 C.F.R. § 21.5(b)(2).

11

The Court in Sandoval held that, although a private cause of action exists to enforce § 601, see 532 U.S. at 279, 121 S. Ct. at 1516 ("private individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages"), that right plainly does not extend to the enforcement of disparate impact regulations promulgated under §602. See Sandoval, 532 U.S. at 293, 121 S. Ct. at 1523.

In reaching this decision, the Supreme Court stressed that legislative intent is the only basis upon which a private right of action may be inferred:

> Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.

Id. at 286-87, 121 S. Ct. at 1519-1520 (citations and quotations omitted and emphasis added); see also Gonzaga University v. Doe, -- U.S. --, 122 S. Ct. 2268, 2276, 153 L. Ed. 2d 309 (2002) (The inquiry "simply require[s] a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries.").

Sandoval also clearly delimits the sources that are relevant to our search for legislative intent. First and foremost, we look to the statutory text for "'rights-

12

creating' language." Sandoval, 532 U.S. at 288, 121 S. Ct. at 1521; see also Gonzaga University, 122 S. Ct. at 2275 n.3 ("Where a statute does not include this sort of explicit 'right- or duty-creating language' we rarely impute to Congress an intent to create a private right of action."); Cannon, 441 U.S. at 690 n.13, 99 S. Ct. at 1954 n.13 ("Not surprisingly, the right- or duty-creating language of the statute has generally been the most accurate indicator of the propriety of implication of a cause of action."). "Rights-creating language" is language "explicitly conferr[ing] a right directly on a class of persons that include[s] the plaintiff in [a] case," Cannon, 441 U.S. at 690 n.13, 99 S. Ct. at 1954 n.13, or language identifying "the class for whose especial benefit the statute was enacted." Tex. & Pac. Ry. Co. v. Rigsby, 241 U.S. 33, 39, 36 S. Ct. 482, 484, 60 L. Ed. 874 (1916), quoted in Cannon, 441 U.S. at 689 n.10, 99 S. Ct. at 1953 n.10. In contrast, "statutory language customarily found in criminal statutes . . . and other laws enacted for the protection of the general public," or a statute written "simply as a ban on discriminatory conduct by recipients of federal funds," provides "far less reason to infer a private remedy in favor of individual persons." Cannon, 441 U.S. at 690-93, 99 S. Ct. at 1954-55.

Second, we examine the statutory structure within which the provision in question is embedded. If the statutory structure provides a discernible enforcement mechanism, Sandoval teaches that we ought not imply a private right of action

13

because "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." Sandoval, 532 U.S. at 290, 121 S. Ct. at 1521-22.[8]

Third, if (and only if) statutory text and structure have not conclusively resolved whether a private right of action should be implied, we turn to the legislative history and context within which a statute was passed. See Sandoval, 532 U.S. at 288, 121 S. Ct. at 1520 ("In determining whether statutes create private rights of action, as in interpreting statutes generally, legal context matters only to the extent it clarifies text.") (citation omitted).[9] We examine legislative history with a skeptical eye, because "[t]he bar for showing legislative intent is high. 'Congressional intent to create a private right of action will not be presumed. There must be clear evidence of

---

[8]See also Karahalios v. Nat'l Fed'n of Fed. Employees, 489 U.S. 527, 533, 109 S. Ct. 1282, 1286-87, 103 L. Ed. 2d 539 (1989) ("[I]t is . . . 'an elemental canon' of statutory construction that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies.") (quoting Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 19, 100 S. Ct. 242, 246, 62 L. Ed. 2d 146 (1979)); McDonald, 291 F.3d at 725 ("When Congress creates certain remedial procedures, we are, 'in the absence of strong indicia of contrary congressional intent, . . . compelled to conclude that Congress provided precisely the remedies it considered appropriate.'") (alteration in original) (quoting Karahalios, 489 U.S. at 533, 109 S. Ct. at 1286-87 (quoting Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 15, 101 S. Ct. 2615, 2623, 69 L. Ed. 2d 435 (1981))).

[9]See also Thompson, 484 U.S. at 179, 107 S. Ct. at 516 ("Congress' 'intent may appear implicitly in the language or structure of the statute, or in the circumstances of its enactment.'") (quoting Transamerica Mortgage Advisors, 444 U.S. at 18, 100 S. Ct. at 246); McDonald, 291 F.3d at 723 ("Legislative history can be taken into account where relevant, but the central focus of judicial inquiry must be the 'text and structure' of the statute itself.") (citation omitted).

14

Congress's intent to create a cause of action.'" McDonald, 291 F.3d at 723 (quoting Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342, 1345 (11th Cir. 1997)). Moreover, the legislative history of a statute that is itself unclear about whether a private right of action is implied is unlikely to provide much useful guidance. See Cannon, 441 U.S. at 694, 99 S. Ct. at 1956 ("[T]he legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question.").

Relying exclusively on the text and structure of Title VI, see Sandoval, 532 U.S. at 288, 121 S. Ct. at 1520 ("We . . . begin (and find that we can end) our search for Congress's intent with the text and structure of Title VI."), the Court in Sandoval concluded that Title VI implies no private right to sue for actions not motivated by discriminatory intent that result in a disparate impact. See id. at 293, 121 S. Ct. at 1523. Examining § 601, the Court determined that it does not imply a private right of action for disparate impact claims, because, as noted above, "§ 601 prohibits only intentional discrimination." Id. at 280, 121 S. Ct. at 1516.

The Court turned next to § 602, which, like § 902 of Title IX, authorizes federal agencies "to effectuate the provisions of [§ 601] . . . by issuing rules, regulations, or orders of general applicability." 42 U.S.C. § 2000d-1. The Court concluded that this provision does not imply a private right of action. It first

15

observed that "'rights-creating' language . . . is completely absent from § 602."

Sandoval, 532 U.S. at 288, 121 S. Ct. at 1521.  Indeed, "[f]ar from displaying

congressional intent to create new rights, § 602 limits agencies to 'effectuat[ing]'

rights already created by § 601."  Id. at 289, 121 S. Ct. at 1521 (second alteration in

original) (citation omitted).  Further, the Court noted,

> the focus of § 602 is twice removed from the individuals who will
> ultimately benefit from Title VI's protection.  Statutes that focus on
> the person regulated rather than the individuals protected create "no
> implication of an intent to confer rights on a particular class of
> persons."   Section 602 is yet a step further removed:  it focuses
> neither on the individuals protected nor even on the funding recipients
> being regulated, but on the agencies that will do the regulating.

Id. (quoting California v. Sierra Club, 451 U.S. 287, 294, 101 S. Ct. 1775, 1779, 68

L. Ed. 2d 101 (1981)); see also Touche Ross & Co. v. Redington, 442 U.S. 560, 576,

99 S. Ct. 2479, 2489, 61 L. Ed. 2d 82 (1979) ("The question whether Congress . . .

intended to create a private right of action [is] definitely answered in the negative"

where a "statute by its terms grants no private rights to any identifiable class[.]").

The Court thus concluded that, "[s]o far as we can tell, this authorizing portion of §

602 reveals no congressional intent to create a private right of action."  Sandoval, 532

U.S. at 289, 121 S. Ct. at 1521.

The Court also found that "the methods § 602 . . . provide[s] for enforcing its

authorized regulations . . . suggest" an intent not to create a private right of action.

16

Id. Section 602 provides for extensive administrative enforcement, as well as "elaborate restrictions" of that enforcement, which "tend[s] to contradict a congressional intent to create privately enforceable rights through § 602 itself." Id. at 290, 121 S. Ct. at 1521. In fact, the Court continued, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." Id. at 290, 121 S. Ct. at 1522.[10]

Having determined that § 601 does not imply a private right of action for disparate impact claims and that § 602 does not imply any private right of action at all, the Court concluded that the regulations promulgated by agencies with the power granted to them by § 602 to enforce the provisions of § 601 also cannot be the basis of an implied private right of action for disparate impact claims:

> Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not. Thus, when a statute has provided a general authorization for private enforcement of regulations, it may perhaps be correct that the intent displayed in each regulation can determine whether or not it is privately enforceable. But it is most certainly

---

[10]The Court observed that the suggestion created by an extant enforcement scheme that Congress did not intend to create another enforcement mechanism is "[s]ometimes . . . so strong that it precludes a finding of congressional intent to create a private right of action, even though other aspects of the statute (such as language making the would-be plaintiff 'a member of the class for whose benefit the statute was enacted') suggest the contrary." Id. at 290, 121 S. Ct. at 1522 (quoting Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S., 134, 145, 105 S. Ct. 3085, 3092, 87 L. Ed. 2d 96 (1985)). We need not address any potential tension between the language of a statute and its structure, however, because Jackson's claim creates no conflict between Title IX's text and its structure.

17

> incorrect to say that language in a regulation can conjure up a private
> cause of action that has not been authorized by Congress.  Agencies
> may play the sorcerer's apprentice but not the sorcerer himself.

Id. at 291, 121S. Ct. at 1522 (citations and quotations omitted); see also Touche Ross, 442 U.S. at 577 n.18, 99 S. Ct. at 2489 n.18 ("[T]he language of the statute and not the rules must control").  Thus, while regulations that merely interpret a statute may provide evidence of what private rights Congress intended to create, see Sandoval, 532 U.S. at 284, 121 S. Ct. at 1518 ("A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well."), "regulations that go beyond what the statute itself requires" are not enforceable through a private right of action.  Id. at 293 n.8, 121 S. Ct. at 1523 n.8.  Sandoval thus concluded there is no private right of action to pursue disparate impact claims under Title VI.

## II.

With this template in front of us, we turn to Jackson's contention that Title IX, in conjunction with 34 C.F.R. § 100.7(e), implies a private right of action to remedy the type of retaliation he claims to have suffered.

As noted above, Title IX does not expressly provide any private right of action. See supra at __.  In Cannon v. Univ. of Chicago, 441 U.S. 677, 688-89, 99 S. Ct. 1946, 1953, 60 L. Ed. 2d 560 (1979), however, the Supreme Court held that Title IX

18

implies a private right of action in favor of direct victims of gender discrimination. A woman who was denied admission by two medical schools brought suit against the schools under Title IX, alleging that their admissions policies discriminated against women. Carefully applying the four-part test set out in Cort v. Ash, 422 U.S. 66, 78, 95 S. Ct. 2080, 2088, 45 L. Ed. 2d 26 (1975), see supra note __,[11] the Court found

---

[11]The Court first noted that the text of § 901 "explicitly confers a benefit on persons discriminated against on the basis of sex." Cannon, 441 U.S. at 694, 99 S. Ct. at 1956. That is, Title IX contains precisely the type of "rights-creating language" in favor of an identifiable class -- victims of gender discrimination -- that militates in favor of implying a private right of action. The second Cort factor, the Court likewise found, cuts in favor of finding a private right of action, because at the time of Title IX's passage, Title VI -- on which Title IX was modeled, see supra at __ -- was understood to imply a private right of action. See Cannon, 441 U.S. at 696, 99 S. Ct. at 1957 ("In 1972 when Title IX was enacted, the critical language in Title VI had already been construed as creating a private remedy."). Congress, the Court reasoned, was therefore aware that Title IX would be interpreted similarly and tacitly consented to this interpretation.

Under the third Cort factor, the Court gleaned from Title IX's legislative history that it was enacted to promote "two related, but nevertheless somewhat different, objectives:" "to avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." Cannon, 441 U.S. at 704, 99 S. Ct. at 1961; see also id. at704 n.36, 99 S. Ct. at 1961 n.36 (discussing legislative history of Title IX); Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 286, 118 S. Ct. 1989, 1997, 141 L. Ed. 2d 277 (1998). The Court observed that the first of these objectives is "generally served by the statutory procedure for the termination of federal financial support for institutions engaged in discriminatory practices" set forth in § 902. Cannon, 441 U.S. at 704, 99 S. Ct. at 1961. Cutting off federal funding is, however, a "severe" remedy of "last resort" that "often may not provide an appropriate means of accomplishing the second purpose . . . ." Id. at 704-705 & n.38, 99 S. Ct. at 1961-62 & n.38. The Court thus concluded that "[t]he award of individual relief to a private litigant who has prosecuted her own suit is not only sensible but is also fully consistent with -- and in some cases even necessary to -- the orderly enforcement of the statute." Id. at 705-06, 99 S. Ct. at 1962.

Finding the fourth Cort factor also favored implying a private right of action, the Court in Cannon concluded that "all of [the Cort factors] support the same result. Not only the words and history of Title IX, but also its subject matter and underlying purposes, counsel implication of a cause of action in favor of private victims of discrimination." Id. at 709, 99 S. Ct. at 1964 (emphasis added).

19

that Title IX implies a private right of action "in favor of private victims of discrimination." Id. at 709, 99 S. Ct. at 1964 (emphasis added). The Court implied this private right of action in the plaintiff's favor based, not on § 902 or the regulations promulgated pursuant to it, but exclusively on the text, structure, and legislative history of § 901.

The Supreme Court has plainly receded from the four-part Cort analysis that animated Cannon, focusing instead only on congressional intent to create a private right of action. See supra note __. But the Court has not overturned the specific holding of Cannon, and so a direct victim of gender discrimination still may pursue a private right of action under Title IX to remedy the discrimination she has suffered.

In Cannon, however, the Supreme Court had no occasion to address the questions before us today: whether Title IX implies a private right of action to redress retaliation resulting from Title IX complaints or whether individuals other than direct victims of gender discrimination have any private rights under Title IX at all. Nor has any subsequent decision of the Supreme Court or this Court resolved these questions. We therefore face the basic question of whether to imply a private right of action and a private remedy for retaliation in favor of an individual who is not himself a direct victim of gender discrimination. After reading Title IX in the manner required by Sandoval, we can find nothing in the language or structure of

20

Title IX creating a private cause of action for retaliation, let alone a private cause of action for retaliation against individuals other than direct victims of gender discrimination.

## A.

We begin with the text of § 901. See supra at __. Section 901 aims to prevent and redress gender discrimination and does so by requiring that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); see also Cannon, 441 U.S. at 704, 99 S. Ct. at 1961. Nothing in the text indicates any congressional concern with retaliation that might be visited on those who complain of Title IX violations. Indeed, the statute makes no mention of retaliation at all.[12] Our

___

[12]In contrast, when Congress wished to prohibit retaliation against individuals who complain about employment discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 78 Stat. 253, as amended, 42 U.S.C. § 2000e et seq., it did so explicitly as part of the statute itself. See 42 U.S.C. § 2000e-3(a). The anti-retaliation section of Title VII provides in pertinent part that it shall be an unlawful employment practice for any employer to retaliate against an employee or an applicant for employment "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). We recognize that Title VII is of limited usefulness in interpreting Title IX, both because Title VII was enacted pursuant to Congress's Commerce power, while both Title VI and IX were enacted pursuant to Congress's Spending Clause power, and because the text and structure of Title VII are markedly different than that of Title IX. See Gebser, 524 U.S. at 286, 118 S. Ct. 1989. Nonetheless, the fact that Congress felt required to prohibit retaliation expressly under Title VII may indicate that Congress did not intend the concept of "discrimination" in Title IX to be read sufficiently broadly to cover retaliation.

21

task, as <u>Sandoval</u> makes clear, is to interpret what Congress actually said, not to guess from congressional silence what it might have meant. The absence of any mention of retaliation in Title IX therefore weighs powerfully against a finding that Congress intended Title IX to reach retaliatory conduct. <u>See</u> <u>Litman v. George Mason Univ.</u>, 156 F. Supp. 2d 579, 584-85 (E.D. Va. 2001) ("Congress was aware that it could create a right of action for retaliatory treatment, and it did so in Title VII; it did not do so in Title IX.").

Section 902 of Title IX, <u>see</u> <u>supra</u> note __, does not vary our conclusion that Congress did not intend Title IX to prohibit retaliation. Section 902, like its twin § 602, is devoid of "rights-creating" language of any kind -- whether against gender discrimination, retaliation, or any other kind of harm. Instead, again like § 602, it explicitly directs and authorizes <u>federal agencies</u> to regulate recipients of federal funding to effectuate the anti-discrimination provisions of § 901. As detailed above, <u>see</u> <u>supra</u> at __, it provides an enforcement mechanism -- the cessation of federal funding -- and imposes "elaborate restrictions on agency enforcement." <u>Sandoval</u>, 532 U.S. at 290, 121 S. Ct. at 1521. These restrictions include requirements that agencies first attempt to attain voluntary compliance, that agencies hold a hearing and make express findings of noncompliance before cutting off funding, and that agencies provide Congress thirty days to consider any proposed funding cut off. <u>See</u> 20

22

U.S.C. § 1682. That § 902 is thus concerned exclusively with the power of federal agencies to regulate recipients of federal funds renders its focus, like §602's,"twice removed" from any consideration of what harm Title IX is meant to remedy. Sandoval, 532 U.S. at 289, 121 S. Ct. at 1521. Section 902 plainly does not disclose any congressional intent to imply a private right of action of any kind, let alone against retaliation.

Moreover, as Sandoval teaches, Section 902's provision of an administrative enforcement mechanism, coupled with § 903's provision of judicial review, strongly counsels against inferring a private right of action against retaliation, because "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." Sandoval, 532 U.S. at 290, 121 S. Ct. at 1521-22.

We conclude, much like the Supreme Court did in Sandoval, that nothing in the text or structure of §§ 901 and 902 yields the conclusion that Congress intended to imply a private cause of action for retaliation. While we "have a measure of latitude to shape a sensible remedial scheme that best comports with the statute" when determining the scope of a judicially implied right and the remedies it makes available, Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 284, 118 S. Ct. 1989, 1996, 141 L. Ed. 2d 277 (1998), we are not free to craft a right that there is no

evidence Congress intended to create. See id. ("[W]e generally examine the relevant statute to ensure that we do not fashion the scope of an implied right in a manner at odds with the statutory structure and purpose."); see also id. at 285, 118 S. Ct. at 1997 (We must "'attempt to infer'" from all available indicia "'how the [1972] Congress would have addressed the issue had the . . . action been included as an express provision in the' statute.") (alterations in original) (quoting Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 178, 114 S. Ct. 1439, 1448, 128 L. Ed. 2d 119 (1994)); Sandoval, 532 U.S. at 286, 121 S. Ct. at 1519 ("Statutory intent . . . is determinative."). Our review of §§ 901 and 902 unearths absolutely no indication that Congress intended Title IX to prevent or redress retaliation. Because the text thus evinces no concern with retaliation, we are not free to imply a private right of action to redress it.

Nor does 34 C.F.R. § 100.7(e)'s prohibition on retaliation, see supra at __, imply such a private right of action or create a private remedy. It is true, as Jackson asserts, that § 100.7(e) identifies a class to which it extends its protection: "any individual" retaliated against for "complain[ing], testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding or hearing" undertaken to enforce Title IX. This regulatory identification of a protected class cannot be taken, however, as "rights-creating," for the simple reason that "[l]anguage in a

24

regulation . . . may not create a right that Congress has not." Sandoval, 532 U.S. at 291, 121 S. Ct. at 1522. Quite simply, if Congress did not enact a statute creating a private cause of action, we cannot find its intent to do so in this regulation. Because Congress has not created a right through Title IX to redress harms resulting from retaliation, 34 C.F.R. § 100.7(e) may not be read to create one either.[13]

B.

Moreover, even if Title IX did aim to prevent and remedy retaliation for complaining about gender discrimination, Jackson is plainly is not within the class meant to be protected by Title IX. As Cannon held, § 901 identifies victims of gender discrimination as the class it aims to benefit, and so implies a private right of action in their favor. Nowhere in the text, however, is any mention made of individuals other than victims of gender discrimination. Gender discrimination

---

[13]In our only previous encounter with the question, we expressly declined to resolve whether 34 C.F.R. § 100.7(e) creates a private right of action for retaliation. See Paisey v. Vitale, 807 F.2d 889, 895 n.8 (11th Cir. 1986) ("Paisey . . . makes the argument that . . . he is entitled to an injunction as part of his relief pursuant to his private cause of action against Nova for violation of the anti-retaliation regulation. That issue is not properly before us."). Before Sandoval, the Fourth Circuit had determined that a victim of gender discrimination does have a private right of action for retaliation. See Preston v. Commonwealth of Va. ex rel. New River Cmty. Coll., 31 F.3d 203, 206 (4th Cir. 1994) ("Retaliation . . . for filing a claim of gender discrimination is prohibited under Title IX."). The only two cases that have resolved a claim for retaliation under Title IX after Sandoval -- both of which were decided by district courts -- have both reached the oppposite conclusion. See Atkinson v. Lafayette Coll., 2002 WL 123449 at *11 (E.D. Pa. Jan. 29, 2002) ("[I]n the wake of Sandoval, there is no private right of action under Title IX to enforce the anti-retaliation regulation. . . ."); Litman, 156 F. Supp. 2d at 584-85 ("Congress was aware that it could create a right of action for retaliatory treatment, and it did so in Title VII; it did not do so in Title IX.").

25

affects not only its direct victims, but also those who care for, instruct, or are affiliated with them -- parents, teachers, coaches, friends, significant others, and coworkers.  Congress could easily have provided some protection or form of relief to these other interested individuals had it chosen to do so -- especially for a harm as plainly predictable as the retaliation here at issue[14] -- but it did not do so expressly. Nor does any language in § 902 evince an intent to protect anyone other than direct victims of gender discrimination.  Indeed, as with § 602 of Title VI, the focus of § 902 is "twice removed" from victims of gender discrimination, Sandoval, 532 U.S. at 289, 121 S. Ct. at 1521, and, consequently, thrice-removed from individuals like Jackson who are not themselves the victims of gender discrimination.  Here, there is quite simply no indication of any kind that Congress meant to extend Title IX's coverage to individuals other than direct victims of gender discrimination.  We are not free to extend the scope of Title's IX protection beyond the boundaries Congress

---

[14]In an analogous statutory context, claims for retaliation are often raised by individuals who are not themselves disabled but are affiliated with disabled individuals under § 504 of the Rehabilitation Act, 29 U.S.C. § 794.  See, e.g., Weber v. Cranston Sch. Comm., 212 F.3d 41, 43-44 (1st Cir. 2000) (parent); Hoyt v. St. Mary's Rehab. Ctr., 711 F.2d 864, 865 (8th Cir. 1983) (friend); Lillbask v. Sergi, 193 F.Supp. 2d 503, 515 (D. Conn. 2002) (guardian); Whitehead v. Sch. Bd. for Hillsborough County, 918 F.Supp. 1515, 1522 (M.D. Fla. 1996) (parents); Ross v. Allen, 515 F.Supp. 972, 976(S.D.N.Y. 1981) (school psychologist).  Courts have generally found that a private right exists to redress this type of retaliation, but this is in large part because the statutory text of the Rehabilitation Act explicitly extends its remedies to "any person aggrieved by an act or failure to act by any recipient of Federal assistance . . . under section 794 of this title." 29 U.S.C. § 794a(a)(2) (emphasis added).

26

meant to establish, and we thus may not read Title IX so broadly as to cover anyone other than direct victims of gender discrimination.

We thus hold that Title IX does not imply a private right of action in favor of individuals who, although not themselves the victims of gender discrimination, suffer retaliation because they have complained about gender discrimination suffered by others.[15]  Statutory intent remains the touchstone of our analysis.  Without it -- and the mandate of Sandoval is crystal clear on this point -- we simply cannot imply a private right of action, no matter how desirable the result may be.  And our review of

_____

[15]As far as we can discern, we are the first court of appeals to resolve this question after the Supreme Court rendered its opinion in Sandoval.  Our decision today is, we note, contrary to the lone circuit decision that addressed this question prior to Sandoval, Lowrey v. Texas A & M Univ. Sys., 117 F.3d 242 (5th Cir. 1997).  The Fifth Circuit held in Lowrey that 34 C.F.R. § 100.7(e) can of its own force provide the basis for an implied private right of action for retaliation suffered by individuals not themselves the victims of gender discrimination.  See id. at 253.  To reach this conclusion, it relied on an earlier Fifth Circuit opinion that had observed in passing while construing the Wagner-Peyser Act of 1933 (which establishes the United States Employment Service, see 29 U.S.C. § 49 et seq.) that "civil remedies may be implied from regulations, as well as statutes." Gomez v. Fla. State Employment Ser., 417 F.2d 569, 576 n.29 (5th Cir. 1969).  Ignoring the statutory text contained in §§ 901 and 902 of Title IX and focusing exclusively on 34 C.F.R. § 100.7(e), Lowrey applied the four-part Cort test to reach its conclusion that § 100.7(e) implies a private right of action.  To reach this conclusion, Lowrey relied heavily on the third Cort factor -- finding that "the implication of a private right of action for retaliation would serve the dual purposes of title IX, by creating an incentive for individuals to expose violations of title IX and by protecting such whistleblowers from retaliation," id. at 254 (footnote omitted) -- while giving conspicuously little consideration to whether Congress intended to create such a private right of action.

After Sandoval, we believe the reasoning in Lowrey is unpersuasive.  Accordingly, we do not follow Lowrey, either in its exclusive reliance on 34 C.F.R. § 100.7(e) to imply a private right of action, see Sandoval, 532 U.S. at 291, 121S. Ct. at 1522 ("[I]t is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress."), or in its application of the Cort factors that gives short shrift to legislative intent. See Sandoval, 532 U.S. at 286-87, 121 S. Ct. at 1519-1520 ("Statutory intent . . . is determinative.").

27

both the text and structure of Title IX yields no congressional intent to create a cause of action for retaliation, particularly for a plaintiff who is not a direct victim of gender discrimination. Congress is, of course, free to create a private right of action for retaliation under Title IX and may extend its protection beyond direct victims of gender discrimination. Until it does so, however, <u>Sandoval</u> plainly precludes a federal court from implying such a right or expanding the class benefitted by Title IX. The district court was therefore correct to dismiss Jackson's complaint.[16]

**AFFIRMED.**

---

[16]Because we find that Jackson has no private right of action under Title IX, we do not reach the Board's other claims that (i) Jackson lacks standing to assert such a right because he has not suffered an adverse employment action, or that (ii) his claim for retaliation is preempted by the retaliation provisions of Title VII.