**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SURJIT K. BHELLA, Dr.,
                    *Plaintiff-Appellee,*

v.

GORDON R. ENGLAND, Secretary of
the Navy,
                    *Defendant-Appellant,*

and

RICHARD DANZIG,
                    *Defendant.*

No. 02-2416

SURJIT K. BHELLA, Dr.,
                    *Plaintiff-Appellant,*

v.

GORDON R. ENGLAND, Secretary of
the Navy,
                    *Defendant-Appellee,*

and

RICHARD DANZIG,
                    *Defendant.*

No. 02-2439

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Patrick Michael Duffy, District Judge.
(CA-99-2046-2-23)

Argued: September 24, 2003

Decided: February 12, 2004

Before WIDENER, TRAXLER, and KING, Circuit Judges.

---

Reversed and remanded by unpublished per curiam opinion.

---

### COUNSEL

**ARGUED:** John Harris Douglas, Assistant United States Attorney, Charleston, South Carolina, for Appellant. Anthony Christopher Potts, HITCHCOCK & POTTS, Charleston, South Carolina, for Appellee. **ON BRIEF:** J. Strom Thurmond, Jr., United States Attorney, Charleston, South Carolina, for Appellant.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

### OPINION

PER CURIAM:

In this Title VII case involving claims of race and national origin discrimination, the jury awarded plaintiff Surjit Bhella $1,500,000 (later reduced by the district court) on her hostile environment claim asserted against the Secretary of the Navy. The government appeals, challenging the district court's denial of its motion for judgment as a matter of law. Bhella cross-appeals, challenging the district court's refusal to submit her retaliation claim to the jury. We conclude that the evidence was insufficient to establish that Bhella was subjected to an objectively hostile work environment, and we therefore reverse the district's court denial of the government's motion for judgment as a matter of law. On Bhella's cross-appeal, we conclude that the district court erred by granting the government's motion for judgment as a matter of law as to the retaliation claim, and we therefore remand for a new trial on that claim alone.

## I.

The evidence presented at trial established the following facts, which we recount in the light most favorable to Bhella, giving her the benefit of all inferences that reasonably can be drawn from the evidence. *See, e.g.*, *Private Mortgage Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 311-12 (4th Cir. 2002); *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001). Where important, however, we also note the government's contrary view of the evidence presented at trial.

### A.

Surjit Bhella was born in India, where she received a university degree in education and served as a teacher and school principal. Bhella moved with her husband to the United States in 1969. Bhella continued her education in this country, obtaining master's and doctorate degrees in education, with an emphasis on counseling. Bhella thereafter held various jobs, including coordinator of the Student Improvement Program at Iowa State University, director of the Education Department at Lincoln Trade College in Indiana, and executive director of the Southeastern Illinois Mental Health Agency. In 1986, Bhella and her family moved to Charleston, South Carolina. Bhella first worked at Baker Hospital, running the hospital's counseling program, and then later went to work for the Veteran's Administration. After twice applying for a position, Bhella was hired in January 1989 as a civilian employee at the Naval Consolidated Brig that was then under construction in Charleston.

The Brig houses military prisoners. As part of its mission to rehabilitate its prisoners, the Brig offers various classes and counseling services. Bhella served as the Brig's education supervisor and oversaw the work of four instructors. In 1990, Bhella took on additional duties as the "program evaluator." As the program evaluator, Bhella conducted surveys among the prisoners while they were housed at the Brig and after they were released, entered the raw information obtained through the surveys into a computer program to turn the information into usable data, and then analyzed the data to help determine the effectiveness of the programs being provided by the Brig.

Before Bhella took on the program evaluator duties, no one was performing that function at the Brig.

The Brig is headed by a Commanding Officer ("CO"); directly beneath the CO in the Brig's organizational structure is the Executive Officer ("XO"). The CO reports to a Washington-based division of the Bureau of Navy Personnel referred to as Personnel Office 84 ("Pers84"), which also supervises the operation of a sister brig in California (the "Miramar brig"). Pers84 has the authority to make decisions affecting Brig personnel, including "influence over what jobs would be deleted or removed . . . in a downsizing situation." J.A. 296. When Bhella was hired at the Brig, Guy Campbell was the CO. Campbell was replaced by Michael Ralston in April 1991, who was in turn replaced by Anne Bushong in 1993. From February 1993 until October 1994, Willard Dixon was the Brig's XO. He was followed in that position by Wendy Gee. For all time periods relevant to this appeal, Bill Peck headed Pers84. In her duties as education supervisor, Bhella reported directly to the CO. As program evaluator, Bhella reported to Michael Rucker, the Brig's Correctional Programs Officer.

Bhella had a positive working relationship with COs Campbell and Ralston. Campbell testified that Bhella was "an exceptional employee," that he "was very taken with her performance," and that she had his "complete confidence." Supp. J.A. 8-9. Ralston had similar praise for Bhella, stating that he "found her to be exceptionally professional and productive and generally outstanding." J.A. 283. Bhella's relationship with Michael Rucker and a few other superiors, however, was not as positive, as even CO Ralston recognized. Ralston testified that Bhella's other superiors criticized Bhella for "causing trouble" and described her as a "constant complainer" who had "difficulty managing her people." J.A. 284. Ralston did not believe the complaints to be valid, in part because of the exceptional performance of Bhella's Education Department, which he viewed as "an indicator that somebody's doing something right." J.A. 284.

On May 29, 1993, Bhella filed a complaint with the Brig's EEO office alleging various claims of discrimination. Rucker learned of the complaint on June 7, 1993, during a meeting with the EEO counselor.

On June 18, 1993, CO Ralston's tour of duty with the Brig ended, and he was replaced as CO by Anne Bushong.

In late June, Bushong and Rucker asked Bhella to withdraw her EEO complaint. Bhella refused. Around the same time, Rucker refused to allow Bhella to attend an educational conference that Ralston had authorized Bhella to attend before he left the Brig. Rucker and then-XO Dixon also informed Bhella that she no longer needed to attend the weekly senior staff meetings that she had been attending for more than three years.

In September, the Brig, without any prior discussions with Bhella, reassigned some of Bhella's duties (developing college programs) to Rucker and another Brig official. *See* J.A. 66. Later that month, Rucker upgraded the ratings Bhella had assigned to two of her subordinates during their annual performance review. Bhella had rated the employees at level four (excellent). The employees complained to Rucker, who without input from Bhella raised the ratings to level five (outstanding), even though Rucker had approved of Bhella's initial rating of the employees. Rucker thereafter evaluated Bhella and rated her at level three (fully successful), the lowest rating Bhella had ever received during her tenure at the Brig, and the lowest rating for that period of any civilian employee at the Brig. Bhella complained to Rucker about the rating, but he refused to change it.

On Friday, October 15, 1993, Bhella was asked to attend a meeting in XO Dixon's office, a meeting also attended by Rucker. At the meeting, Bhella learned that her position as education supervisor was being eliminated and that, effective October 18, she was being detailed for 120 days to the Clinical Services Department to assist the director of that department. Bhella had no prior knowledge that the Brig was contemplating a job change, and the Brig gave Bhella no reason for the change except to say that she was needed by the director of Clinical Services.

Lieutenant Colonel William Wall, the director of the Clinical Services Department, testified that he learned about Bhella's transfer only a few days before Bhella did, in a meeting with CO Bushong and XO Dixon. Wall testified that CO Bushong told him that Bhella was being transferred to his department because "it would be a great fit."

J.A. 392. Wall testified that he did not request the transfer, was not consulted about the transfer, and had no specific need for Bhella in his department. Sanford Seymour, director of the Brig's Correctional Services department, testified that CO Bushong told him that Bhella was transferred to the Clinical Services department "as a resolution" of Bhella's EEO complaints. *See* J.A. 487.

Once detailed to Clinical Services, Bhella had no supervisory responsibilities, no position description, and no job title. She was expected to complete the program evaluation research project she had been conducting, but she was given no other specific duties or responsibilities. The letter (written by XO Dixon) detailing Bhella to Clinical Services indicated that Bhella was to assist Wall "in conducting research activities." J.A. 577. The letter explained that Bhella's

> performance in fulfilling similar duties in the past indicates to me that your professional expertise can best be used by the command in this position. The importance of validating and evaluating the effectiveness of the various Brig programs and conducting follow-up studies will be essential to the future creditability of [the Brig].

J.A. 577. Dixon's letter stated that Bhella's duties would be "undescribed" upon assignment, but that "[d]uring this detail, duties will naturally develop and you should define the duties more clearly and in greater detail. Ultimately, you should be able to write a position description which can then be classified." J.A. 577.

During her time in the Clinical Services department, Bhella repeatedly asked Wall for assignments. His responses to those requests were fairly vague—he would tell Bhella that the CO had not yet decided on duties for Bhella, or that "he w[ould] think about it and get back to [Bhella]." J.A. 84. Bhella asked Wall if she could create her own position description (as the detail letter indicated she should do), but Wall told her that he would write the position description. Bhella also provided Wall with lists of projects and responsibilities that she believed she was qualified to perform, but she was permitted to undertake very few of the requested assignments. Unhappy with the detail to Clinical Services and the loss of her supervisory responsibili-

ties, Bhella in November 1993 filed a second and then a third EEO complaint.

The government contends that the elimination of Bhella's position and her transfer to Clinical Services was required by an "efficiency review" that the Brig underwent beginning in 1992. A report issued in September 1993 in connection with the efficiency review recommended the elimination of the Education Supervisor position, a recommendation also made with regard to the Miramar brig. The order to implement the recommendations of the efficiency review, however, did not come until April 1994, six months after Bhella was detailed to Clinical Services.

In May 1994, Bhella was finally given additional work to do—program evaluation functions similar to those she had performed while she was Education Supervisor. To properly carry out these duties, Bhella needed upgraded computer software, training for the new software, and an administrative assistant to help with the data entry. Between May and October 1994, Bhella made repeated requests for these items, but she received only sporadic, part-time data entry help. Her other requests were not granted.

In September 1994, Wendy Gee replaced Dixon as the Brig's XO, and by October 1994, Gee had learned of the EEO complaints filed by Bhella. Also in October, Gee moved Bhella from Clinical Services and placed her under Gee's direct supervision.

Bhella suffered from various medical problems during the time she worked at the Brig, including depression, back problems, chronic fatigue, and fibromyalgia. Her depression began worsening as the situation at work deteriorated. By early December 1994, Bhella's depression was severe enough that her doctor recommended she be hospitalized. Bhella provided Gee with a note from her doctor and requested that Gee keep confidential the reason for her absence. Bhella was hospitalized for approximately two weeks. When she returned to work on December 19, 1994, Bhella gave Gee a note from her doctor indicating that she was fit to return to work. Bhella quickly realized that Gee had not honored her request for confidentiality, because many Brig employees asked her about her hospitalization. Bhella felt humiliated, and she was unable to work on December 20

and 21. On Christmas Eve, Bhella received a memo from Gee order-
ing her to "[i]mmediately provide this command with certification
from your treating physician that you have been released to return to
full duty." J.A. 626. The memo required that the medical certification
"specify factors which you do not meet or duties which you cannot
perform or can perform with limitations." J.A. 626. The memo stated
that "[f]ailure to provide the required medical statement may be
grounds for disciplinary action." J.A. 627. Although she believed that
she had already provided the Brig with the necessary information,
Bhella complied with Gee's directive.

On December 28, 1994, Bhella requested 240 hours of advanced
sick leave so that she could participate in a four-week pain rehabilita-
tion treatment program. Gee denied the request, noting that the policy
for advanced sick leave required that all accumulated sick leave first
be exhausted. When Bhella requested the leave, she had only four
hours of accumulated sick leave. On January 27, 1995, Bhella sent a
letter to the Navy Inspector General and the personnel section in
Washington complaining of harassment and discrimination by Gee
and others. On February 1, 1995, Bhella filed another EEO complaint.

In February 1995, Bhella attended a conference in Washington,
D.C. The program evaluator at the Miramar brig also attended the
conference, and he told Bhella that she was going to be transferred to
California to work with him. Bhella was surprised by this informa-
tion, and over the course of the next month she had several conversa-
tions with Gee about it. During one such conversation, Gee "was very
loud, very abusive," and called Bhella a liar. J.A. 142. On March 28,
1995, Bhella sent a letter complaining of harassment to the Defense
Hotline at the Pentagon and to the Chief of Naval Personnel.

Steven Batts, who worked in the Brig's Correctional Services
department, testified that at a staff meeting in March 1995, Gee was
very upset about the complaints that Bhella had filed. According to
Batts, Gee "made [it] clear . . . that we were not to have any contact
with Dr. Bhella or assist her in any way." J.A. 356. Batts testified that
Gee "was clearly infuriated about the fact that Dr. Bhella filed the
complaint. It was one of the things that I remember, is how dare her
file a complaint." J.A. 356-57. According to Batts, Gee thereafter
issued an order to search Bhella's office "for anything that would dis-

close what the IG complaint was about, what she was working on, anything related to any notes that might help shed light on what Dr. Bhella was working on." J.A. 358. There is no dispute that on March 30, Gee ordered Steve Morrison, head of Brig security, to search Bhella's office and conduct an investigation of Bhella. The government, however, contends that the investigation was triggered by questions about Bhella's timekeeping practices that were brought to the attention of the command by a Brig employee.

On April 12, 1995, Morrison submitted to Gee a report summarizing the results of his investigation. Morrison's report listed various offenses that he believed Bhella had committed, including attending a seminar during work hours on March 23 without permission and falsifying her time card for that day. That same day, Gee sent to Bhella (who was at home on sick leave) a letter notifying her that the Brig was proposing to terminate Bhella and listing five specific infractions the Brig believed Bhella had committed. The offenses described by Gee in her letter included two charges of unauthorized absence. According to the letter, the first unauthorized absence occurred on February 16, when Bhella returned a day early from a conference but did not report to work, and the second unauthorized absence occurred on March 23, when Bhella attended a local workshop without permission. The letter also charged Bhella with failing to attend certain mandatory monthly training sessions and with repeatedly filling out leave slips incorrectly, despite being counseled on the correct way to fill out the slips. Finally, the letter charged Bhella with "abusively" requiring a Brig employee to change Bhella's time sheet to reflect annual leave instead of sick leave. J.A. 648.

The letter gave Bhella an opportunity to respond to the charges and stated that, if the Brig determined that removal was warranted, the proposed removal would be effective no earlier than thirty days from the date of the letter. Under Navy regulations, employees under a proposed removal from duty typically remain at work in their usual positions during the notice and response period. However, if the employee poses a threat to herself or others, the employee may be removed from duty (without any loss of pay) during the notice period. Gee's letter of proposed removal informed Bhella that she was excused from duty with pay until the matter was resolved and explained that Bhella was "prohibited from entering the Brig facilities except as noted. I

have arranged for you to be escorted in the Brig to retrieve your personal belongings on 17 April 1995 between the hours of 0800-1130." J.A. 649. As instructed by the letter, Bhella returned to the Brig on April 17 to retrieve her belongings. She was escorted to her office by two Brig employees, who watched while she packed, escorted her back to her car, and then demanded her identification card. At trial, Bhella described that experience as the "most humiliating experience in [her] life." J.A. 153.

Sometime after she retrieved her office belongings, Bhella submitted her response to the proposed removal. In her response, Bhella was able to largely refute each of the charges leveled against her. For example, as to the unauthorized absence on February 16, Bhella presented a note submitted to and signed by XO Gee dated February 10. The note stated: "As we discussed on 8 Feb that I plan to catch a late flight on 2-15-95. If it works I will stay home on 2-16-95. However with your approval I listed 2-16-95 as travel day." J.A. 650. As to the unauthorized absence on March 23, Bhella submitted a copy of a flyer advertising the seminar upon which Bhella had written a note asking for permission to attend. Gee approved the request, signing off on the flyer that Bhella had given her and on the formal travel authorization form. As to the training sessions, Bhella submitted logs showing that she had signed out and viewed the videotape of each training session in question, which was an authorized way of completing the mandatory training. The Brig rescinded the proposed removal once it reviewed Bhella's response.

Bhella returned to work on May 11, 1995. The next day, she received a memo from Gee stating that "there will be a major shift in focus of your duties from primarily supporting Pers-84's Navy Corrections Evaluation Program to supporting evaluation within the Brig." J.A. 663. Bhella lost most of her responsibilities with regard to the Navy Corrections Evaluation Program, which had involved receiving and analyzing evaluation data from brigs on the East Coast, making regular visits to those brigs, and attending conferences in Washington, D.C. The memo detailed the new duties that Bhella would be taking on, which included revising exit questionnaires and evaluating various programs within the Brig. Bhella viewed her new assignments as being primarily clerical in nature, and she testified that people at work were "very hostile. Very cold." J.A. 175. Although

Bhella wanted to work, she felt "very humiliated, very demoralized." J.A. 175. Her depression again worsened, and she missed two days of work. She returned to work on May 18, 1995, but did not return to the Brig thereafter until April 2001, when she believed her depression was sufficiently under control.

Bhella testified that when she returned to work in 2001, the XO informed her that the program evaluator position had been eliminated six months earlier and that Bhella would not be attending staff meetings and would not be given any assistance. After working one day, Bhella decided that she was not yet able to return to work. The next day, she sent the Brig a letter explaining that she was following her doctor's advice and would not be returning to work. Bhella included a letter from her psychiatrist, who stated that "Dr. Bhella is not psychologically able to deal with her return to work at this facility. The negative association with the situation and facility are such that her depression has worsened, as have her associated symptoms. . . . Returning to a hostile environment would risk her chances of recurring major depression. I have advised her to let the job go so she can move on." J.A. 797.

The facts discussed above recount the major incidents of what Bhella believes was discrimination by Brig officials. Bhella also presented evidence of more minor incidents that she believes show discrimination on the part of the Brig. For example, Bhella testified that during December 1994, XO Gee freely granted discretionary leave to various employees, leave that was not charged against the employee's annual leave. But when Bhella requested 15 minutes of leave to deliver presents to a local orphanage, Gee denied the request. Petty Officer Leon Larce, who for a period of time provided administrative assistance to Bhella and then to CO Bushong and XO Gee, testified that Bushong and Gee would schedule meetings with Bhella but refuse to meet with her once Bhella arrived. Bhella also complained that she was excluded from a conference held in Charleston that she believed was attended by her counterpart at the Miramar brig, that she was never appointed by the CO to serve on any boards or commissions, and that her name was omitted from a listing of Brig staff on the front cover of the Brig's telephone directory.

Bhella also testified about problems she had with Gee regarding leave slips. When requesting sick leave, Bhella sometimes checked on

the leave form the box indicating that she was sick as well as the box indicating that she had been injured on the job. Bhella also included comments on the leave forms—writing "depression" beside the checked-off sickness box, J.A. 622, and once noting that leave was required "due to the hostile environment at work," J.A. 646. Gee always granted the requested leave, but she apparently took issue with the way Bhella filled out the forms. For example, Gee struck through Bhella's "depression" notation and wrote "please bring doctors slip to clarify." J.A. 622. Beside Bhella's hostile environment comment Gee inserted the words "vague" and "unsubstantiated." J.A. 646. These incidents formed the basis of one of the charges included in the April 1995 notice of proposed removal. The Brig ultimately determined that there was nothing improper about the way Bhella had filled out the slips, but that Gee had violated Brig policy by striking through Bhella's entries.

## B.

Bhella also presented evidence of various comments made to and about her by Brig officials. In 1990, not long after she was hired at the Brig, Bhella asked Rucker why, given her qualifications and experience, she was forced to apply for her position twice. According to Bhella, Rucker explained that he was "reluctant to hire [her] because of [her] education from India and [her] experience from India." J.A. 56. In 1992, Rucker sat in on a meeting between Bhella and one of her subordinates. Rucker told Bhella that he was attending the meeting because Bhella "speak[s] broken English and I want to make sure [the subordinate] understands." J.A. 56. On another occasion, Rucker suggested that Bhella's concerns about another employee could be caused by her language skills—"maybe you speak broken English, he doesn't understand you." J.A. 57.

In 1992 and 1993, then-CO Ralston had several telephone conversations about Bhella with Pers84 director Peck. At least twice, Peck described Bhella as "a mad Sikh,"[1] J.A. 296, and, on more than one

---

[1]A Sikh is "[a] member of a monotheistic religious group, originally established in India (chiefly in the Punjab) by Guru Nanak in the early part of the 16th century." Oxford English Dictionary, Online Edition, *available at* http://dictionary.oed.com.

occasion, Peck referred to Bhella as "an Indian causing trouble by making complaints." J.A. 297. Although Bhella was not a party to the conversations between Ralston and Peck, Ralston and another Brig employee later related to her the substance of Peck's comments.

Steven Batts[2] testified that he heard the Brig's budget officer make fun of Bhella's accent and once state, after reviewing Bhella's time-card, that she was "not going to pay the dumb bitch." J.A. 353. According to Batts, corrections officers frequently singled out Bhella by making her show her identification card at the security window before they would allow her to enter, even though the officers typically allowed other employees to enter without showing identification. Batts also recounted watching the corrections officers manipulate the release buttons on the heavy security doors in such a way that Bhella's body would slam into the doors when she tried to open them. Batts reported the incident to XO Dixon, but Batts did not believe Dixon took the matter seriously.

Batts also testified that Steve Morrison (who had conducted the March 1995 investigation of Bhella) regularly made fun of Bhella's accent and that Morrison once told Batts he wanted to "bend [Bhella] over the table" and "f---- her." J.A. 355. In addition, Batts testified that sometime after the investigation of Bhella, Morrison was unhappy because he did not receive recognition at a Brig ceremony and stated, "[t]his is the thanks I get for doing the dirty work on Dr. Bhella." J.A. 359.

## C.

In June 1999, Bhella filed this action asserting numerous claims of discrimination and retaliation. The district court granted summary judgment against many of Bhella's claims, and the case proceeded to trial on Bhella's claims that the government discriminated against her on the basis of her race and national origin, created a hostile working environment, and retaliated against her after she complained about the discrimination.

---

[2]As will be discussed in more detail later, the government argues that the district court erred by admitting portions of Batts's testimony.

After consideration of the evidence presented at trial, the district court granted the government's motion for judgment as a matter of law as to Bhella's disparate treatment and retaliation claims, thus permitting the jury to consider only the hostile environment claim. The jury found in favor of Bhella and returned a general verdict in the amount of $1,500,000. Because 42 U.S.C.A. § 1981a imposes limits on awards for certain categories of compensatory damages, the district court submitted interrogatories to the jury that permitted the jury to itemize the damages awarded to Bhella. The jury broke down its verdict as follows: $13,800 for medical expenses; $132,000 for physical pain and suffering; $350,000 for back wages; and $1,004,200 for injury to professional standing, character, and reputation. The court thereafter granted the government's post-trial motion to reduce the damages for pain and suffering and injury to professional standing to the statutory limit of $300,000. *See* 42 U.S.C.A. § 1981a(b)(3)(D) (West 2003); *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 852-53 (2001) (explaining that the limitations contained in section 1981(a) apply only to categories of compensatory damages not previously available under Title VII). The court denied the government's motions for judgment as a matter of law and for a new trial and also denied Bhella's motion for a new trial.

Both Bhella and the government appeal. The government contends that the district court erred by denying its motion for judgment as a matter of law and submitting the hostile environment claim to the jury. For her part, Bhella argues that if the jury's verdict on the hostile environment is set aside, then she is entitled to a new trial on the retaliation claim, which she contends the district court improperly rejected. We will consider the issues raised by the government first, and then proceed to the issue raised in Bhella's cross-appeal.

II.

Title VII makes it illegal for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a)(1) (West 2003). Because Bhella was a civilian employee of the Department of the Navy, her claim is governed by 42 U.S.C.A. § 2000e-16(a) (West

2003), which provides that "[a]ll personnel actions . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." Notwithstanding the differences in wording, sections 2000e-2 and 2000e-16 generally have been treated as comparable, with the standards governing private-sector claims applied to claims under section 2000e-16. *See Bundy v. Jackson*, 641 F.2d 934, 942 (D.C. Cir. 1981) ("Despite the difference in language . . . , we have held that Title VII places the same restrictions on federal . . . agencies as it does on private employers, and so we may construe the latter provision in terms of the former.") (citation omitted); *see also Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981) (en banc) (discussing section 2000e-16 and "comparable provisions of Title VII, most notably § 703(a)(1), 42 U.S.C. § 2000e-2(a)(1)"); *Brown v. Perry*, 184 F.3d 388, 393-94 (4th Cir. 1999) (applying private-sector Title VII cases to discrimination claim brought by federal employee).

It is by now well-settled that Title VII's prohibition against discrimination by an employer extends not only to the decision to hire or fire, but also to conduct giving rise to what is typically referred to as a "hostile work environment." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) ("We have repeatedly made clear that although the statute mentions specific employment decisions with immediate consequences, the scope of the prohibition is not limited to economic or tangible discrimination, and that it covers more than terms and conditions in the narrow contractual sense. Thus, . . . sexual harassment so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment violates Title VII.") (citations, internal quotation marks and alterations omitted). To prevail on her hostile environment claim, Bhella was required to present evidence establishing that "(1) the subject conduct was unwelcome; (2) it was based on the [race or national origin] of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." *Spicer v. Virginia Dep't of Corrections*, 66 F.3d 705, 710 (4th Cir. 1995) (en banc); *see also Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc), *petition for cert. filed* (Nov. 24, 2003). "To be actionable, the conduct must create an objectively hostile or abusive work environment, and the victim must also

perceive the environment to be abusive." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001).

On appeal, the government contends that the district court erred by denying its motion for judgment as a matter of law and submitting the claim to the jury. The government argues that the conduct about which Bhella complains was insufficient to support a hostile environment claim because Bhella's evidence did not establish that the conduct was sufficiently severe or pervasive, nor did it establish that any actions were motivated by discriminatory animus. We review *de novo* the denial of a motion for judgment as a matter of law. *See Ocheltree*, 335 F.3d at 331. "The question is whether a jury, viewing the evidence in the light most favorable to [Bhella], could have properly reached the conclusion reached by this jury." *Benesh v. Amphenol Corp. (In re Wildewood Litigation)*, 52 F.3d 499, 502 (4th Cir. 1995). "While we are compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them, we must grant judgment as a matter of law when there is no legally sufficient evidentiary basis for the verdict." *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 259 (4th Cir. 2001) (citations and internal quotation marks omitted).

Here, Bhella was able to establish the first element of her hostile work environment claim, that the conduct in question was unwelcome. Bhella's evidence established at least one serious action taken against her, as well as a series of lesser work-related indignities, all at the hands of a number of different individuals. And while it is clear from Bhella's evidence that many people at the Brig were intent on making her life there very difficult, the critical question in this case is *why* Brig officials were intent on making Bhella's life difficult. As noted above, Bhella can prevail on her hostile environment claim only if she can show that hostility towards her race or national origin is what motivated the Brig officials. We believe that Bhella's evidence fails to make this showing.

To show racial or national origin animus on the part of Brig officials in Charleston, Bhella points to Mike Rucker, who told her that he originally hesitated to hire her because her education and experience were from India. But Rucker, of course, eventually did hire Bhella, which seems to indicate that any concern he had was fairly minor, and there is no evidence connecting this statement to any of

the actions about which Bhella complains. Bhella also notes that Rucker twice described her as speaking "broken English." The only other evidence of discriminatory attitudes at the Brig was the testimony that the budget officer and the head of security made fun of Bhella's accent behind her back.[3] While certainly inappropriate, this evidence is not sufficiently connected to the actions taken against Bhella to carry Bhella's burden of proving that the actions were motivated by discriminatory animus.

Even when we add to the mix the statements made by Bill Peck, head of Pers84 in Washington, we still cannot find sufficient evidence of discriminatory animus. According former CO Ralston, Peck referred to Bhella as "a mad Sikh," J.A. 296, and as "an Indian causing trouble by making complaints," J.A. 297. These comments, however, were made as much as a year before any of the actions about which Bhella complains, thus rendering the comments of little probative value on Bhella's hostile environment claim.[4] *See Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 512 (4th Cir. 1994) (concluding that statement made two years before a challenged action were irrelevant in age discrimination case: "This remoteness in time makes it inappropriate to use Fennessey's statement as evidence of age discrimination.").

Accordingly, after carefully reviewing the record, we find that Bhella failed to carry her burden of showing that any of the actions about which she complained were caused by hostility on the part of Brig officials to Bhella's race or national origin.[5] The district court,

---

[3]Bhella also points out that the budget officer once called Bhella a "dumb bitch," and that the head of security once made the tasteless comment about wanting to bend Bhella over a table. While rude or even crass, these comments in no way indicate that Bhella's treatment was because of her race or national origin.

[4]As we will explain later, however, Peck's trouble-making Indian comment is highly relevant to Bhella's retaliation claim.

[5]Our conclusion on this point makes it unnecessary to consider the government's argument that the actions about which Bhella complains were not sufficiently severe or pervasive to support a hostile environment claim.

therefore, erred by denying the government's motion for judgment as a matter of law on Bhella's hostile environment claim.

### III.

Because we have concluded that the evidence was legally insufficient to support the jury's verdict on Bhella's hostile environment claim, we now proceed to consider Bhella's cross-appeal. In her cross-appeal, Bhella contends that the district court erred by granting judgment as matter of law on her claim that the Brig retaliated against her for pursuing her discrimination claims. We agree.

In addition to prohibiting discriminatory practices, Title VII prohibits retaliation against an employee who has engaged in activity protected by Title VII, such as filing a complaint of discrimination. *See* 42 U.S.C.A. § 2000e-3(a) (West 2003) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter. . . ."). To prove illegal retaliation, Bhella must show: (1) that she engaged in protected activity, (2) that she suffered an adverse (or tangible) employment action, and (3) that the Brig took the adverse action because of Bhella's protected activity. *See Bryant v. Aiken Regional Med. Centers, Inc.*, 333 F.3d 536, 543 (4th Cir. 2003), *petition for cert. filed* (Oct. 16, 2003). That we have rejected Bhella's hostile environment claim does not affect her ability to establish a retaliation claim, provided that she reasonably believed she was the subject of prohibited discrimination. *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 357 n.1 (4th Cir. 1985) ("An underlying discrimination charge need not be meritorious for a plaintiff to prevail on a claim of retaliation for opposition to the perceived discrimination."), *overruled in part on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228, 238 n.2 (1989); *see also Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003) ("[T]o show protected activity, the plaintiff in a . . . retaliation case need only prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring.") (internal quotation marks and alteration omitted).

The government does not contend that Bhella's belief that she was being discriminated against was unreasonable, nor does the govern-

ment otherwise dispute that Bhella's multiple filings of EEO complaints satisfies the requirement that Bhella engaged in a "protected activity." Likewise, the government does not suggest that it was unaware of the complaints filed by Bhella. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (explaining that knowledge by the employer of the plaintiff's protected activity is "absolutely necessary" to establish causation in a retaliation case). Instead, the government argues that Bhella failed to prove that she suffered an adverse employment action or that any such action was casually connected to Bhella's protected activity. We disagree.

## A.

We consider first the requirement that Bhella show that she suffered an adverse employment action, and we find that it was met. In October 1993, the Brig detailed Bhella to Clinical Services, where she languished for more than six months with essentially no job duties. In our view, this action quite easily fits within the Supreme Court's formulation of an adverse (or tangible) employment action: one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, *reassignment with significantly different responsibilities*, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (emphasis added); *see also Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) ("[R]eassignment with significantly different responsibilities . . . generally indicates an adverse action.") (internal quotation marks omitted).

In addition, while the existence of one adverse employment action is enough to support Bhella's retaliation claim, we note that a reasonable jury could also conclude that Bhella suffered another adverse employment action in connection with the April 1995 notice of proposed removal. Whether or not the notice of proposed removal itself can be considered an adverse employment action,[6] Bhella testified

---

[6]There are cases from this circuit that appear to reach differing answers to this question. *Compare Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) (placing employee on administrative leave during investi-

that when she returned to work after the Brig rescinded the proposed removal, she was stripped of her "professional" duties and was instead assigned primarily clerical duties. While the government disputes Bhella's characterization of her duties upon her return, it does not dispute that Bhella's job duties changed when she came back to work. There is enough of a factual dispute here to require a jury to determine whether the change of duties constituted an adverse employment action.

## B.

We likewise conclude that Bhella's evidence was sufficient to permit a reasonable jury to conclude that the government took the adverse employment action in retaliation for Bhella's filing of the EEO complaints. "Normally, very little evidence of a causal connection is required to establish a *prima facie* case. In fact, we have held that merely the closeness in time between the filing of a discrimination charge and an employer's firing an employee is sufficient to make a *prima facie* case of causality." *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir. 1998) (citation and internal quotation marks omitted).

In this case, Bhella filed an EEO complaint at the end of May, some four-and-a-half months before she was transferred to Clinical Services. This time period between the protected activity and the adverse employment action is somewhat longer than in other cases where the causation requirement was satisfied simply by the temporal

gation of complaint lodged against employee is not an adverse employment action) *with Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1229 (4th Cir. 1998) (including in a listing of adverse employment actions taken by the employer an investigation of the plaintiff that did not result in a loss of pay or termination). Because Bhella's retaliation claim is not dependent upon a determination that the notice of proposed removal constitutes an adverse employment action, we need not resolve the question. We likewise decline to consider whether any of the other actions about which Bhella complains could be considered adverse employment actions. The district court on remand is free to consider the issue *de novo*.

proximity of the protected activity and the adverse action. *See King v. Rumsfeld*, 328 F.3d 145, 151 & n.5 (4th Cir.) (concluding that ten-week period between protected activity and termination "gives rise to a sufficient inference of causation to satisfy the prima facie requirement," but noting that the time period was "sufficiently long so as to weaken significantly the inference of causation between the two events"), *cert. denied*, 72 U.S.L.W. 3129 (Dec. 8, 2003); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (causal connection established by evidence that complaint filed approximately three months before plaintiff was terminated); *see also Wells v. Colorado Dep't of Transp.*, 325 F.3d 1205, 1217 (10th Cir. 2003) ("A five-month gap between a protected activity and an adverse action would ordinarily be too great a time lapse to support an inference of causation based on timing alone.").

We need not, however, decide whether an inference of causation could be drawn solely from the temporal proximity, because Bhella presented additional evidence tending to show that the transfer was a reaction to the EEO complaints she filed. First, Sanford Seymour, the director of the Brig's Correctional Services department, testified on cross-examination that CO Bushong told him that Bhella was transferred to Clinical Services "as a resolution" for her EEO complaints. J.A. 487. In addition, as the government acknowledges in its brief, Bhella presented evidence showing that someone from Pers84, most likely Bill Peck, agreed that Bhella should be detailed to Clinical Services. Given Peck's involvement in the transfer decision and Seymour's testimony about the purpose behind the transfer, a jury could reasonably conclude that it was the EEO complaints that led Peck to describe Bhella as a trouble-making Indian and that the transfer to a job with no duties was punishment for the complaints. We therefore conclude that Bhella's direct and circumstantial evidence of causation, along with the temporal proximity of the complaint and the transfer, is more than enough to permit a reasonable jury to conclude that the Brig transferred Bhella to a job with almost no duties or responsibilities because she filed EEO complaints.

The government, however, insists that the elimination of Bhella's position as education supervisor was dictated by the efficiency review, and that Bhella had no duties in Clinical Services because she never wrote a position description for herself, as she was directed to

do. While there is some force to these arguments, the government's view is not the only reasonable interpretation of the facts.

As noted above, the Brig never mentioned the efficiency review when informing Bhella or Lieutenant Colonel Wall about the transfer, and Bhella was transferred months before the Brig received the order to implement the directives of the efficiency review. As to Bhella's failure to develop a position description, the letter detailing Bhella to Clinical Services stated that "[d]uring this detail, duties will naturally develop and you should define the duties more clearly and in greater detail. Ultimately, you should be able to write a position description which can then be classified." J.A. 577. Bhella testified that she repeatedly requested assignments from Wall and suggested duties that she could perform, but she received essentially no duties for more than six months. Thus, Bhella's duties did not "naturally develop," which would seem to make it difficult for Bhella to draft a position description. Moreover, Bhella testified that Wall, then her direct supervisor, repeatedly told her that he would write the position description. Finally, the evidence established that, had she not been detailed to Clinical Services, Bhella would have been entitled to transfer to another job (if she had the necessary qualifications) once the efficiency review was implemented and her position as education supervisor eliminated. From all of this evidence a jury could reasonably conclude that the Brig transferred Bhella to Clinical Services and stripped her of any meaningful duties so that she would simply leave the Brig rather than transfer into a different position once the efficiency review was implemented.

Of course, the jury could just as reasonably accept the government's argument that it transferred Bhella into Clinical Services in order to keep her at the Brig even after implementation of the efficiency review. But because the evidence is reasonably susceptible of two different interpretations, the evidence of an adverse employment action causally connected to Bhella's protected activity is sufficient to warrant submission of the retaliation claim to a jury. *See* Fed. R. Civ. P. 50(a)(1) (explaining that judgment as a matter of law should be granted only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.").

As to the change of duties following the rescission of the notice of proposed removal, Bhella's evidence of causation is quite strong. As

previously discussed, Steven Batts testified that in March 1995, XO Gee indicated at a staff meeting that she was outraged to learn that Bhella had filed a complaint with the Navy Inspector General. Gee made it clear to those attending the meeting that they were not to help Bhella or have any contact with her. Gee then ordered Steve Morrison to search Bhella's office to try to discover information related to the Inspector General complaint and to investigate perceived irregularities in Bhella's time-keeping practices. Morrison's investigation and recommendations to Gee culminated in the April 1995 notice of proposed removal, after which Bhella's job duties were again changed. A jury accepting this evidence could reasonably (and easily) conclude that the actions directed against Bhella were in retaliation for her filing a complaint with the Inspector General.

Accordingly, we conclude that Bhella presented sufficient evidence that the Brig took adverse employment actions against her and that those actions were causally connected to Bhella's protected activities. The district court, therefore, erred by granting judgment as a matter of law as to Bhella's retaliation claim.

## IV.

To summarize, we conclude that the district court erred by submitting Bhella's hostile environment claim to the jury, and we therefore reverse the district court's denial of the government's motion for judgment as a matter of law on that claim.[7] However, we conclude that Bhella presented sufficient evidence to warrant submission of her retaliation claim to the jury. Accordingly, we reverse the district court's granting of the government's motion for judgment as a matter of law and remand for a trial on that claim.

*REVERSED AND REMANDED*

---

[7]In light of this conclusion, we need not decide whether the district court erred by admitted portions of the testimony of Steven Batts. Should the issue arise again after remand, the district court is free to consider the admissibility question *de novo*, taking into account the differences between a hostile environment claim and retaliation claim. We likewise need not consider the government's challenge to the sufficiency of the evidence to support the jury's award of damages for injury to Bhella's professional standing.